CASE NO. 20-2125

IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

_____

THE REDEEMED CHRISTIAN CHURCH OF GOD
(VICTORY TEMPLE) BOWIE, MARYLAND

*Plaintiff-Appellee,*

v.

PRINCE GEORGE'S COUNTY, MARYLAND

*Defendant-Appellant.*

_____

On Appeal From the United States District Court for
the District of Maryland
(Case No. 8:19-cv-00367, Hon. Deborah K. Chasanow)

_____

**BRIEF OF THE SIKH COALITION AND THE GENERAL
CONFERENCE OF SEVENTH-DAY ADVENTISTS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE**

CHRISTOPHER PAGLIARELLA
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Pennsylvania Ave NW, Ste 400
Washington, DC 20006

AMRITH KAUR AAKRE
CINDY NESBIT
THE SIKH COALITION
50 Broad St., Ste 504
New York, NY 10004

ERIKA L. MALEY
    *Counsel of Record*
CHRISTOPHER S. ROSS
ALARIC R. SMITH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000

Counsel for *Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 20-2125       Caption: The Redeemed Christian Church of God v. Prince George's County

Pursuant to FRAP 26.1 and Local Rule 26.1,

The General Conference of Seventh-day Adventists
(name of party/amicus)

who is _____ amicus curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2. Does party/amicus have any parent corporations?   ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Erika L. Maley                    Date:        3/22/2021

Counsel for: The General Conference of Seventh-day Adventists

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _20-2125_     Caption: _The Redeemed Christian Church of God v. Prince George's County_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_The Sikh Coalition_
(name of party/amicus)


who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Erika L. Maley                          Date:      3/22/2021

Counsel for: The Sikh Coalition

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

INTERESTS OF AMICI CURIAE ................................................... 1

STATEMENT OF COMPLIANCE WITH RULE 29(a) ........................... 5

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............. 6

ARGUMENT ......................................................................... 8

I.  RELIGIOUS MINORITIES, INCLUDING THE SIKH AND
    ADVENTIST COMMUNITIES, RELY ON COURTS TO
    GUARANTEE RLUIPA'S BROAD PROTECTIONS ................... 8

    A.  RLUIPA Addresses A Need To Protect Religious Minority
        Communities, Including Sikhs And Adventists, From
        Misunderstanding And Discrimination ............................. 8

    1.  *Impact on Sikhs* ............................................................ 9

    2.  *Impact on Adventist Church* .................................... 13

    B.  RLUIPA Has Been Critical In Protecting The Ability
        Of Sikhs And Adventists To Freely Exercise Their
        Religion ................................................................... 14

II. RLUIPA BROADLY COVERS "LAND USE REGULATION" TO
    PROTECT FREE EXERCISE FROM THE PREJUDICE,
    INDIFFERENCE, AND INTENTIONAL DISCRIMINATION
    OF LOCAL GOVERNMENT REGULATION ............................. 18

III. RLUIPA'S COMPELLING INTEREST TEST DEMANDS MORE
     THAN UNEVIDENCED GENERALIZATIONS AND
     ANECDOTES ................................................................. 23

i

A.    To Satisfy Strict Scrutiny, The Government Must Identify A Compelling Interest In The Application Of The Land Use Regulation To The Particular Claimant ......................23

B.    Anecdotes And Appeals To "Common Sense" Cannot Justify A Substantial Burden Under RLUIPA ..................27

CONCLUSION ...........................................................................................31

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ali v. Stephens,*
822 F.3d 776 (5th Cir. 2016)................................................................24

*Basra v. Morgan,*
No. 3:16-CV-06005-RBL-JRC, 2018 WL 278649 (W.D. Wash.
Jan. 3, 2018)........................................................................................15

*Bethel World Outreach Ministries v. Montgomery Cnty. Council,*
706 F.3d 548 (4th Cir. 2013)...............................................................21

*City of Boerne v. Flores,*
521 U.S. 507 (1997)..........................................................................7, 9

*Cutter v. Wilkinson,*
544 U.S. 709 (2005)..............................................................................9

*Employment Div. v. Smith,*
494 U.S. 872 (1990)..............................................................................8

*Faith Temple Church v. Town of Brighton,*
405 F. Supp. 2d 250 (W.D.N.Y. 2005)................................................22

*Fortress Bible Church v. Feiner,*
694 F.3d 208 (2d Cir. 2012) ..............................................18, 19, 21, 22

*Ghailani v. Sessions,*
859 F.3d 1295 (10th Cir. 2017)...........................................................25

*Guru Nanak Sikh Soc'y v. Cnty. of Sutter,*
456 F.3d 978 (9th Cir. 2006)..................................................15, 22, 30

*Holt v. Hobbs,*
574 U.S. 352 (2015)...............................................................19, 24, 28

*Hundal v. Lackner*,
No. EDCV 08-00543-CAS MA, 2011 WL 1935734 (C.D. Cal. Apr. 12, 2011), *report and recommendation adopted*, 2011 WL 1979044 (C.D. Cal. May 20, 2011)...............................................................15

*Jesus Christ Is The Answer Ministries, Inc. v. Balt. Cnty.*,
915 F.3d 256 (4th Cir. 2019)...........................................................8

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001).......................................................................28

*Madison v. Riter*,
355 F.3d 310 (4th Cir. 2003)...........................................................9

*Midrash Sephardi, Inc. v. Town of Surfside*,
366 F.3d 1214 (11th Cir. 2004).....................................................30

*Miss. Band of Choctaw Indians v. Holyfield*,
490 U.S. 30 (1989).........................................................................23

*Moore v. City of E. Cleveland*,
431 U.S. 494 (1977).......................................................................20

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
584 F. Supp. 2d 766 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010)..................................................................................17, 21

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
831 F. Supp. 2d 871 (D. Md. 2011) .............................................17

*Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*,
No. RWT 05-CV-1688, 2011 WL 3101801 (D. Md. July 22, 2011) .....................................................................................16, 17

*Sherbert v. Verner*,
374 U.S. 398 (1963).........................................................8, 13, 26

*Singh v. Goord*,
520 F. Supp. 2d 487 (S.D.N.Y. 2007) .........................................15

*Smith v. Owens*,
848 F.3d 975 (11th Cir. 2017)..........................................................25

*St. John's United Church of Christ v. City of Chicago*,
502 F.3d 616 (7th Cir. 2007)...........................................................21

*Tagore v. United States*,
735 F.3d 324 (5th Cir. 2013).............................................................16

*Tanzin v. Tanvir*,
141 S. Ct. 486 (2020)......................................................................19

*Thomas v. Review Bd.*,
450 U.S. 707 (1981).........................................................................26

*United States v. Bhagat Singh Thind*,
261 U.S. 204 (1923).........................................................................11

*United States v. Carter*,
669 F.3d 411 (4th Cir. 2012)......................................................27, 28

*United States v. Cnty. of Culpeper*,
245 F. Supp. 3d 758 (W.D. Va. 2017)........................................21, 22

*Westchester Day Sch. v. Vill. of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007) ............................................................29

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)................................................................8, 25, 27

*Wofford v. Williams*,
No. 07-cv-192, 2008 WL 3871756 (D. Or. Aug. 20, 2008) ..............17

*Young v. Am. Mini Theatres, Inc.*,
427 U.S. 50 (1976)...........................................................................20

**Statutes**

Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141,
107 Stat. 1488...................................................................................8

42 U.S.C. § 2000bb ...................................................................8, 14, 25

42 U.S.C. § 2000cc ...................................................................6, 7, 19

42 U.S.C. §§ 2000cc to 2000cc-5.................................................1

42 U.S.C. § 2000cc-1(a) .............................................................23

42 U.S.C. § 2000cc-3(g).............................................................6, 19

42 U.S.C. § 2000cc-5..................................................................19

## Legislative Materials

146 Cong. Rec. S7774 (daily ed. July 27, 2000) ..................................29

146 Cong. Rec. E1564 (daily ed. Sept. 21, 2000) ................................14

S. Rep. No. 103-111 (1993) ..........................................................8

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ..............................................20

Fed. Bureau of Investigation, U.S. Dep't of Justice, *2018 Hate Crime Statistics* (2019), https://ucr.fbi.gov/hate-crime/2018/topic-pages/victims...............................................................12

Henna Kaur Kaushal, *Sikhs in America: "Perpetually Foreign, Automatically Suspect, and Potentially Terrorist,"* Calif. L. Rev. Online (July 2020), www.californialawreview.org/sikhs-in-america...................................................................................9

Introduction to Sikhism, 1 Religious Organizations and the Law ................1

Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39 Fordham Urb. L.J. 1021 (2012) ................17

Karen Leonard, *Punjabi Farmers and California's Alien Land Law*, 59 Agricultural History 549 (1985) ..................................................12

Seventh-day Adventist Church, *History of the Seventh-day Adventists*, https://www.adventist.org/church/what-do-seventh-day-adventists-believe/history-of-seventh-day-adventists/ (last visited Mar. 22, 2021).........................................13

Sikh American Legal Defense and Education Fund, *Who Are Sikh-Americans?*, https://saldef.org/who-are-sikh-americans/ (last visited Mar. 22, 2021).........................................10

U.S. Dep't of Justice, *Combating Religious Discrimination Today: Final Report* (July 2016), https://www.justice.gov/crt/file/877936/download ........................................12

U.S. EEOC, *EEOC Resolves Religious Bias Suit for Seventh-day Adventist Fired Over Observing Sabbath* (July 20, 2009), https://www.eeoc.gov/newsroom/eeoc-resolves-religious-bias-suit-seventh-day-adventist-fired-over-observing-sabbath-0 ........................................14

## INTERESTS OF AMICI CURIAE

The Sikh Coalition is a nonprofit, nonpartisan organization founded in the wake of the September 11th attacks to counter misconceptions, promote cultural understanding, and advocate for the civil liberties of all people, especially Sikhs. It is the largest Sikh civil-rights organization in the country, providing direct legal services in cases of hate crimes, racial profiling, bullying, workplace discrimination, and other religious rights violations. The Coalition also advocates for legislative change, educates the public about Sikhs and diversity, promotes local community empowerment, and fosters civic engagement amongst Sikh Americans. *See* Introduction to Sikhism, 1 Religious Organizations and the Law § 1:23 (treatise chapter extensively citing Sikh Coalition legal work). The Sikh Coalition has also advised both state and federal agencies on addressing discrimination and bias, including assisting the U.S. Department of Justice in developing its training on Sikh cultural competency.

The Sikh Coalition has engaged in significant litigation regarding the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), codified at 42 U.S.C. §§ 2000cc to 2000cc-5, including filing suit on behalf of a Sikh prisoner who was denied a religious accommodation to maintain

unshorn facial hair as an article of faith.  *See Basra v. Cate*, No. 11-1676 (C.D. Cal. 2011).  In both the land use and prisoner rights' context, the Sikh Coalition has authored amicus briefs in the federal courts of appeals and the U.S. Supreme Court, advocating for a robust interpretation of RLUIPA's protections.  *See, e.g.*, Brief of the Sikh Coalition and Muslim Public Affairs Council, *Holt v. Hobbs*, No. 13-6827 (U.S.) (prisoners' rights under strict scrutiny); Brief of the Church of Jesus Christ of Latter-day Saints *et al.*, *Tree of Life Christian Schools v. City of Upper Arlington*, No. 18-944 (U.S.) (multi-organization brief on RLUIPA equal-terms land-use standard; also joined by General Conference of the Seventh-day Adventist Church); Brief of the Sikh Coalition, *Sims v. Secretary*, No. 19-13745 (11th Cir.) (access to RLUIPA rights for prisoner); *see also* Brief of the Sikh Coalition, *Tanzin v. Tanvir*, No. 19-71 (U.S.) (scope of remedies under the Religious Freedom Restoration Act).  The Sikh Coalition has also filed complaints with the Department of Justice's Office of Civil Rights regarding RLUIPA violations, seeking the Department's intervention to combat biased policies and practices.

The General Conference of Seventh-day Adventists is the national administrative body for the Seventh-day Adventist Church, a Protestant Christian denomination with more than 22 million members worldwide and

1.2 million members in the United States. The Church operates the largest Protestant school system in the world, with nearly 7,600 schools, more than 80,000 teachers, and 1,545,000 students. The Church operates 65 healthcare institutions in the United States and also operates publishing houses, an international development NGO, and numerous community service centers. Since its founding, the Seventh-day Adventist Church has held a long commitment to religious liberty. From its earliest days, the Adventist Church experienced conflicts between its values and the requirements of governments. Through its own programs and the work of the International Religious Liberty Association founded in 1893, the Adventist Church has worked to guarantee religious liberty for all people in the United States and around the world.

Relevant to this case, the Seventh-day Adventist Church supported the passage of RLUIPA, and has since filed *amicus* briefs in major RLUIPA matters. *See, e.g.*, Brief of the Int'l Mission Bd. of the Southern Baptist Convention *et al.*, *Holt v. Hobbs*, No. 13-6827 (U.S.) (multi-party brief); Brief of the Coalition for the Free Exercise of Religion, *Cutter v. Wilkinson*, No. 03-9877 (U.S.) (multi-party brief in support of successful defense of RLUIPA's constitutionality); *Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, No.

09-1188 (10th Cir.) (General Conference of Seventh-day Adventists as *amicus* in support of RLUIPA equal-terms claim); *see also* Brief of the General Conference of Seventh-day Adventists, *Tanzin v. Tanvir*, No. 19-71 (U.S.).

The Sikh Coalition and General Conference of Seventh-day Adventists therefore share a significant interest in ensuring that access to the rights granted by a unanimous Congress under RLUIPA are not frustrated by Prince George's County's novel arguments to limit its protections. *Amici* submit this brief to provide broader context demonstrating the importance of a proper interpretation of RLUIPA.

## STATEMENT OF COMPLIANCE WITH RULE 29(a)

*Amici* obtained consent to file this brief from both Plaintiff-Appellee Victory Temple and Defendant-Appellant Prince George's County.

This brief is submitted pursuant to Rule 29 of the Federal Rules of Appellate Procedure.  No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except amici curiae, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.[1]

---

[1] This brief is prepared in part by a clinic operated by Yale Law School, but does not purport to present the School's institutional views, if any.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Congress unanimously passed the Religious Land Use and Institutionalized Persons Act ("RLUIPA") based on voluminous evidence that disfavored religious communities, especially those of minority faiths, suffer from improper governmental burdens in the land use and institutionalized person contexts. RLUIPA thus vindicates the promise of the First Amendment by providing a bulwark against arbitrary or prejudiced denials of basic religious rights in these areas. These protections have been critical to members of the Sikh religious community, who have frequently faced prejudice, misunderstanding, and heavy governmental burdens on exercising their core religious beliefs. And a diverse array of religious communities—including the Adventist Church—have benefited from RLUIPA's protections against the unjust or arbitrary application of building regulations against unfamiliar religious communities.

Here, the district court correctly interpreted RLUIPA "in favor of a broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), to encompass all land use regulations involving "individualized assessments," *id.* § 2000cc(a)(2)(C). The County's argument that RLUIPA should be construed to cover only regulations designated as "zoning" under *state* law would

6

allow states to discriminatorily evade RLUIPA's coverage at will. Such a construction would destroy RLUIPA's protection for vulnerable minority faiths, contrary to the clear purpose of the statute and its express rule of construction. The district court properly rejected this argument as lacking any support in precedent or the statutory text.

This Court should also affirm the district court's holding that the government must prove it has a specific compelling interest in the particular restriction imposed on the party. When a state or local government's actions regarding land use or institutionalized persons substantially burden religious exercise, RLUIPA requires that those actions satisfy strict scrutiny, 42 U.S.C. § 2000cc, "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The County's contention that governments can satisfy strict scrutiny with generalizations and anecdotes untethered to the actual religious plaintiff would turn the law on its head and eviscerate RLUIPA. This Court should affirm.

## ARGUMENT

## I.  RELIGIOUS MINORITIES, INCLUDING THE SIKH AND ADVENTIST COMMUNITIES, RELY ON COURTS TO GUARANTEE RLUIPA'S BROAD PROTECTIONS.

### A.  RLUIPA Addresses A Need To Protect Religious Minority Communities, Including Sikhs And Adventists, From Misunderstanding And Discrimination.

Under the First Amendment, religious individuals and groups have traditionally enjoyed robust protections for the free exercise of religion.  *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Sherbert v. Verner*, 374 U.S. 398 (1963); *see also* S. Rep. No. 103-111, at 5 (1993) (Senate Judiciary Committee Report on Religious Freedom Restoration Act).  With its decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), however, a closely divided Supreme Court limited the substantive reach of Free Exercise Clause claims. *See id.* at 877–79; *Jesus Christ Is The Answer Ministries, Inc. v. Balt. Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019) (describing *Smith* as applying "rational basis review" to "neutral" laws "of general applicability" that have "the incidental effect of burdening religious exercise").  In response to *Smith*, Congress passed the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488, to restore the pre-*Smith* heightened scrutiny standard.  42 U.S.C. § 2000bb(b)(1).  After the Supreme Court held RFRA

could not apply to states, *Flores*, 521 U.S. at 536, Congress again stepped in to "reinstate RFRA's protection against government burdens on religious exercise imposed by states and localities by enacting" RLUIPA. *Madison v. Riter*, 355 F.3d 310, 315 (4th Cir. 2003).

RLUIPA restores the strict-scrutiny standard for free exercise claims against state and local governments in the domains of land use and institutionalized persons. Congress intended this strict scrutiny standard to end the widespread practice of state and local governments creating "frivolous or arbitrary" barriers to the free exercise of religion, "documented[] in hearings spanning three years." *Cutter v. Wilkinson*, 544 U.S. 709, 716 (2005). For over twenty years, courts have interpreted RLUIPA in line with its promises.

RLUIPA's protection is particularly critical for members of unfamiliar or minority religious communities such as Sikhs and Seventh-day Adventists.

*1.    Impact on Sikhs*

Sikhs are a minority religious community within the United States, and have often faced discrimination and misunderstanding. *See generally* Henna Kaur Kaushal, *Sikhs in America: "Perpetually Foreign, Automatically*

*Suspect, and Potentially Terrorist*," Calif. L. Rev. Online (July 2020), https://www.californialawreview.org/sikhs-in-america; Sikh American Legal Defense and Education Fund, *Who Are Sikh-Americans?*, https://saldef.org/who-are-sikh-americans/ (last visited Mar. 22, 2021) (providing information about Sikhism and challenges faced by community).

Sikhism is the fifth largest world religion, with over 25 million followers. The founder of the Sikh faith, Guru Nanak, was born in 1469 in Punjab, India. His teachings, as well as the teachings of nine successive Gurus, form the basis of the Sikh religion. The Sikh religion is monotheistic, believing in one God that is all loving, all pervading and eternal. This God of love is obtained through grace and sought by service to humankind. Guru Nanak declared all human beings as equal. He taught that God was universal to all—not limited to any religion, nation, race, color, or gender.

Sikhism mandates that its adherents maintain a physical identity that makes them stand out in public. This identity includes five articles of faith: kesh (unshorn, uncut hair all over the body), kanga (a small comb), kara (a steel bracelet), kirpan (a religious article resembling a knife), and kachera (soldier-shorts). Sikhs must also wear a turban (dastaar) over their unshorn

hair.[2]  The turban remains one of the most visibly distinctive features of Sikh practice.  The articles of faith signify an individual's commitment to Sikhism and to the highest ideals of love and service to humanity.  They serve as an external uniform that unites Sikhs and binds them to the beliefs of the religion, and they are a daily reminder that Sikhs must live an honest, moral, kind, brave, and loving life.

Sikhs were among the first immigrants from South Asia and began settling in California and Washington around the late 1800s.  They opened the first Sikh gurdwara (*i.e.*, a temple) in the U.S. in 1912.  Some local communities viewed Sikhs as "foreign" and suspicious because of their skin color, beards, and turbans.  Sikhs faced housing discrimination, wage discrimination, alien laws, and sometimes outright violence.  In *United States v. Bhagat Singh Thind*, the Supreme Court even ruled that Sikhs (erroneously understood synonymously with "Hindus" as people from India, glossing over the unique identities of Sikhs) were ineligible to become citizens of the United States.  261 U.S. 204, 215 (1923).  Land-use laws capitalized on the Supreme Court decision by preventing "noncitizens," including Sikhs, from

---

[2] Alternatively, some women cover their heads with a long scarf called a chunni.

owning or leasing land. *See* Karen Leonard, *Punjabi Farmers and California's Alien Land Law*, 59 Agric. Hist. 549, 550 (1985).

As the U.S. Department of Justice observed in a 2016 report on Combating Religious Discrimination, misunderstanding and prejudice against Sikhs unfortunately continue to be a problem. After the September 11th attacks, Sikhs and other minority religious communities have faced "elevated levels" of violence. *See, e.g.*, U.S. Dep't of Justice, *Combating Religious Discrimination Today: Final Report* 20 (July 2016), https://www .justice.gov/crt/file/877936/download. The Federal Bureau of Investigation, which tracks hate crimes annually, has consistently released statistics indicating Sikhs are among the three to five most targeted groups in the United States.[3] The violent targeting of Sikhs has even extended to their houses of worship, including a 2012 mass shooting at the gurdwara in Oak Creek, Wisconsin that killed six.

In addition to such tragedies, the Sikh community has also faced subtle discrimination and invidious burdens, including in land use limits and

---

[3] *See* Fed. Bureau of Investigation, U.S. Dep't of Justice, *2018 Hate Crime Statistics* (2019), https://ucr.fbi.gov/hate-crime/2018/topic-pages/victims.

prohibitions on religious articles of faith and access to religious practice. RLUIPA has been critically important in these contexts.

### 2. *Impact on Adventist Church*

The Adventist Church in the United States has faced prominent religious liberty challenges itself, and has engaged in longstanding efforts to promote religious liberty for all people. Among other things, members of the Church uphold "the importance of the seventh-day Sabbath," setting aside Saturday as a day for holy worship. *See* Seventh-day Adventist Church, *History of Seventh-day Adventists*, https://www. adventist.org/church/what-do-seventh-day-adventists-believe/history-of-seventh-day-adventists/ (last visited Mar. 22, 2021). Adventists also observe religious dietary restrictions.

The Supreme Court case *Sherbert v. Verner* related to "a member of the Seventh-day Adventist Church" adhering to the Sabbath. 374 U.S. 398, 399 (1963). The Court found that the member was improperly "force[d] . . . to choose between following the precepts of her religious and forfeiting benefits" under an unemployment compensation law. *Id.* at 404. When RFRA was first enacted, it expressly stated a "purpos[e]" to "restore the

compelling interest test as set forth in *Sherbert v. Verner*." 42 U.S.C. § 2000bb(b).

In recent decades, members of the Seventh-day Adventist Church have continued to face conflict around their basic worship practices, for which religious freedom protections have been invaluable. *See, e.g.*, 146 Cong. Rec. E1564, E1565, (daily ed. Sept. 21, 2000) (statement of Rep. Hyde) (local zoning limits on two Seventh-day Adventist ministries, including one feeding the homeless, that could be addressed by RLUIPA); U.S. EEOC, *EEOC Resolves Religious Bias Suit for Seventh-day Adventist Fired Over Observing Sabbath* (July 20, 2009), https://www.eeoc.gov/newsroom/eeoc-resolves-religious-bias-suit-seventh-day-adventist-fired-over-observing-sabbath-0.

## B. RLUIPA Has Been Critical In Protecting The Ability Of Sikhs And Adventists To Freely Exercise Their Religion.

RLUIPA's protections have proved invaluable in ensuring that local prejudice, lack of cultural awareness, intentional discrimination, or indifference do not burden religious exercise, particularly for minority faith communities.

Members of the Sikh community must frequently resort to RLUIPA to defend their ability to practice their faith. For example, a Sikh gurdwara prevailed at the Ninth Circuit over repeated, unfounded denials of a land use permit that nominally applied state environmental laws and the local zoning code, but which were spurred by complaints from neighbors evincing invidious prejudice. *Guru Nanak Sikh Soc'y v. Cnty. of Sutter*, 456 F.3d 978 (9th Cir. 2006). In holding in favor of the gurdwara, the Ninth Circuit specifically invoked RLUIPA's history as designed to address subtle forms of discrimination masked in neutral terms, which tend to negatively impact minority religious groups. *See id.* at 994.

Likewise, Sikh institutionalized persons must often resort to RLUIPA to obtain accommodations for grooming, dress, and dietary requirements of their faith. *See, e.g.*, *Basra v. Morgan*, No. 3:16-CV-06005-RBL-JRC, 2018 WL 278649 (W.D. Wash. Jan. 3, 2018) (denying summary judgment to prison on RLUIPA claim relating to Sikh prisoner's dietary needs); *Singh v. Goord*, 520 F. Supp. 2d 487, 501–05 (S.D.N.Y. 2007) (denying state agency's motion for summary judgment on prisoner's RLUIPA claim regarding prison's denial of his request to keep a kanga, turban, and a Khanda pendant); *Hundal v. Lackner*, No. EDCV 08-00543-CAS MA, 2011 WL 1935734, at *6 (C.D. Cal.

Apr. 12, 2011), *report and recommendation adopted*, 2011 WL 1979044 (C.D. Cal. May 20, 2011) (denying summary judgment to prison on RLUIPA claim relating to Sikh prisoner's desire to protect beard).

Sikh employees have also relied upon RFRA's parallel protections of their rights in federal workplaces. For example, the Fifth Circuit applied strict scrutiny to analyze a Sikh IRS employee's wrongful discharge due to her request to keep an article of faith on her person at work (a kirpan). *Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013). The court held that the government's "compelling interest in protecting federal buildings" did not justify the "specific conclusion" of banning the employee's kirpan. *Id.* at 330–31.

The Adventist Church has likewise relied on RLUIPA's protections to resist unjust restrictions on religious exercise—relevantly, in a *decade*-long proceeding against Prince George's County on a similar water issue. Prince George's County engaged in an "eight-year legal battle" to prevent Reaching Hearts International, an Adventist congregation, from building a church on its land, including by denying necessary "water and sewer category change applications." *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, No. RWT 05-CV-1688, 2011 WL 3101801, at *1 (D. Md. July 22, 2011). The County lost at

16

trial and in 2008, the district court entered further injunctive relief to (in its words) "attempt to right the wrong," which the Fourth Circuit affirmed in 2010. *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 584 F. Supp. 2d 766, 796 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010).

The County then took a year to act—at which point it again denied Reaching Hearts its water and sewer changed based on "**the same environmental concerns rejected by the jury** … [and] **rejected by th[e] Court**." *Reaching Hearts*, 2011 WL 3101801, at *3 (emphasis in original). After the district court "directed" the County "to show cause why it should not be held in contempt and sanctioned," it ordered the County to correct the unlawful action without prejudice to a renewed sanctions motion. *Reaching Hearts Int'l, Inc. v. Prince George's Cnty.*, 831 F. Supp. 2d 871, 874, 877 (D. Md. 2011).[4]

While RLUIPA's protections have been critical, the statute remains *under*-enforced, particularly in the land use context. *See* Douglas Laycock & Luke W. Goodrich, *RLUIPA: Necessary, Modest, and Under-Enforced*, 39

---

[4] Adventists have also relied upon RLUIPA in the institutionalized person context, including in suits regarding their dietary needs. *See Wofford v. Williams*, No. 07-cv-192, 2008 WL 3871756, at *9 (D. Or. Aug. 20, 2008).

Fordham Urb. L.J. 1021 (2012). Pushing the balance any further against religious adherents would leave them unprotected against the hostility of local governments.

## II. RLUIPA BROADLY COVERS "LAND USE REGULATION" TO PROTECT FREE EXERCISE FROM THE PREJUDICE, INDIFFERENCE, AND INTENTIONAL DISCRIMINATION OF LOCAL GOVERNMENT REGULATION.

In this appeal, the County primarily contends that RLUIPA is inapplicable here because its denial of a water and sewer amendment, which prevented the construction of Victory Temple's church, is not classified as a "zoning action" under Maryland law. The district court correctly rejected this argument when it denied the County's motion to dismiss, holding that RLUIPA provides protections against any "'individualized assessment of the proposed use' [of a] property that 'limits or restrict[s] a claimant's use of development of land.'" JA32. Indeed, the County's argument would give a local government unfettered ability to "evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions," *Fortress Bible Church v. Feiner*, 694 F.3d 208, 218 (2d Cir. 2012), thus eviscerating the law's protection for disfavored religious communities.

18

"Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'"  *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)).  To achieve this goal, RLUIPA specifically commands that it be construed "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."  42 U.S.C. § 2000cc-3(g).  If this provision is to have any effect, it at least requires not construing RLUIPA's terms more narrowly than their ordinary meaning.  *See Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020) (interpreting RFRA pursuant to the statute's "plain meaning," as supplemented by its statutory definitions).

At issue here, RLUIPA applies to "land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2). The statute further defines a "land use regulation" as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land." *Id.* § 2000cc-5(5).  Under its ordinary meaning, "zoning" refers to the division of land and subsequent regulation of the use of land in the different divisions.  *Fortress Bible Church*, 694 F.3d at 216 ("[A]t its core[, zoning] involves the division of a community into zones based on

19

like land use."); *Zoning*, Black's Law Dictionary (11th ed. 2019) ("The legislative division of a region, esp. a municipality, into separate districts with different regulations within the districts for land use, building size, and the like."); *Zoning Ordinance*, Black's Law Dictionary (11th ed. 2019) ("A city ordinance that regulates the use to which land within various parts of the city may be put."); *cf. Moore v. City of E. Cleveland*, 431 U.S. 494, 513–14 (1977) (Stevens, J., concurring in the judgment) (describing a city's "broad zoning power" as the "use [of] its police power, not just to abate a specific use of property which proved offensive, but also to create and implement a comprehensive plan for the use of land in the community"); *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 74 (1976) (Powell, J., concurring) (describing the "zoning power" as imposing "[r]estrictions upon the free use of private land").

Employing this common meaning, the district court correctly concluded that RLUIPA's provisions relating to "land use regulation[s]" reach any individualized assessments restricting the use of land based on its division into categories. JA26-32.

This approach is not novel. This Court, and courts in this Circuit, have routinely taken a functional approach and applied the common meaning of

"zoning" to determine whether RLUIPA applies, rather than looking to the regulations' formal classification under state law. *E.g.*, *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 559 (4th Cir. 2013) (treating an "application for public water and sewer service" as a land use regulation for RLUIPA purposes); *United States v. Cnty. of Culpeper*, 245 F. Supp. 3d 758, 768 (W.D. Va. 2017) (rejecting the county's contention that permitting law was a "public health law" rather than a zoning law for purposes of RLUIPA); *Reaching Hearts Int'l, Inc.*, 584 F. Supp. 2d at 788; *accord Fortress Bible Church*, 694 F.3d at 217 (holding that RLUIPA applied if a municipality used an environmental law "as its vehicle for determining the zoning issues").

By contrast, the County has failed to point to any precedent holding that RLUIPA's application turns upon whether the state defines the particular action at issue as "zoning."[5]   Indeed, the Second Circuit has

---

[5] Instead, the County asserts that using a uniform federal definition would have sweeping consequences such as invalidating eminent domain or political subdivisions.  However, this parade of horribles has not occurred in the twenty years since RLUIPA's passage—even though no case has adopted state-law definitions of zoning as the County urges.  Rather, most courts have concluded that eminent domain is distinct from traditional zoning. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 640

pointedly noted that courts should not "endorse" a construction that incorporates state law, because it "would allow a town to evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions." *Fortress Bible Church*, 694 F.3d at 218; *see, e.g.*, *Cnty. of Culpeper*, 245 F. Supp. 3d at 768. Sutter County, for example, might have evaded review of its mistreatment of the local gurdwara by relying on issues raised under the "environmental review" process. *Guru Nanak*, 456 F.3d at 985. And *Reaching Hearts* — just like this case — involved denials by Prince George's County of water and sewer change requests that prevented the construction of a church.

Left to their own devices, the very state and local governments Congress sought to hold accountable by enacting RLUIPA could also easily evade RLUIPA's strictures by recasting zoning provisions as "traffic codes," "water codes," or other types of local regulations that tend to impact land use. Thus, "the danger that the federal program would be impaired if state law were to control" applies with full force here, requiring a federal

---

(7th Cir. 2007); *Faith Temple Church v. Town of Brighton*, 405 F. Supp. 2d 250, 253–54 n.3 (W.D.N.Y. 2005). And the idea that carving a state into counties is itself a zoning law is far divorced from the ordinary legal meaning of the term.

definition of RLUIPA's terms. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 44 (1989). The need for a "uniform nationwide application," *id.* at 43, of RLUIPA likewise requires a federal definition. *All* religious groups across the country should have the same broad rights to free exercise — whether a Christian church in Maryland or a Sikh congregation in California. *Id.* This Court should affirm the district court's decision.

## III. RLUIPA'S COMPELLING INTEREST TEST DEMANDS MORE THAN UNEVIDENCED GENERALIZATIONS AND ANECDOTES.

### A. To Satisfy Strict Scrutiny, The Government Must Identify A Compelling Interest In The Application Of The Land Use Regulation To The Particular Claimant.

In addition, the district court correctly placed the burden on the government of proving the challenged action is necessary to serve compelling interests *as applied to the specific claimant*. 42 U.S.C. § 2000cc-1(a). The County's contention that it can demonstrate a compelling interest at a generalized level is inconsistent with the demanding standard established by Supreme Court precedent and with strict scrutiny doctrine more generally. The district court's ruling also ensures that religious persons and organizations are given the individualized consideration and legal access that Congress demanded.

The Supreme Court has held that governments must make a particularized showing to satisfy strict scrutiny under RLUIPA. Generalized interests, such as traffic concerns or prison safety in the abstract, do not satisfy RLUIPA's standards. Rather, "RLUIPA, like RFRA, contemplates a 'more focused' inquiry and 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 362–63 (quoting *Hobby Lobby*, 573 U.S. at 726). On that ground, *Holt* rejected a prison's invocation of a "broadly formulated" interest in security as a reason to deny a particular prisoner the right to grow a half-inch beard. *Id.*

Other circuits have correctly and consistently applied *Holt*'s test. For example, the Fifth Circuit has held in RLUIPA cases that "the court does not ask if the challenged policy, in general, furthers a compelling governmental interest . . . Instead, the government must show that 'the compelling[-]interest test is satisfied through application of the challenged law "to the person,"' [which] . . . '"requires . . . look[ing] to the marginal interest in enforcing" the challenged government action in that particular context." *Ali v. Stephens*, 822 F.3d 776, 785 (5th Cir. 2016) (quoting *Holt*, 574 U.S. at 363);

24

*see, e.g., Smith v. Owens*, 848 F.3d 975, 979–81 (11th Cir. 2017) ("*Holt* calls for an individualized, context-specific inquiry" as to the "marginal interest in enforcing" the regulation; that is, to "scrutinize[e] the asserted harm of granting specific exemptions to particular religious claimants" (citation omitted)); *see also Ghailani v. Sessions*, 859 F.3d 1295, 1305 (10th Cir. 2017) ("[U]nder RFRA, a court does not consider the prison regulation in its general application, but rather considers whether there is a compelling government reason . . . to apply the prison regulation to the individual claimant." (citation omitted)).

The strict compelling-interest test appearing in RLUIPA's plain text is underscored by the statute's purposes and its relationship to RFRA. When Congress enacted RFRA, it explained its purpose was "to restore the compelling interest test as set forth in *Sherbert v. Verner* . . . and *Wisconsin v. Yoder*" to neutral laws of general applicability. 42 U.S.C. § 2000bb(b)(1); *see supra*, Part I.A. Like *Holt*, *Sherbert* and *Yoder* require the state to demonstrate a compelling interest in imposing the particular burden at issue on the particular religious claimant. *Yoder*, 406 U.S. at 214, 221–22 (holding that, although the state has a general "interest in universal education," the state's requirement of "an additional one or two years of formal high school for

Amish children in place of their long-established program of informal vocational education would do little to serve those [state] interests"); *Sherbert*, 374 U.S. at 407 (holding that the state interest in preventing harms resulting from "the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work" could not justify the burden imposed in part because "there [was] no proof whatever to warrant [the] fears of malingering or deceit"); *see also Thomas v. Review Bd.*, 450 U.S. 707, 718-19 (1981) (under *Sherbert*, a "compelling state interest" in "avoid[ing] . . . widespread unemployment and the consequent burden on the fund" could not justify denying unemployment benefits to a religious claimant because the State provided "no evidence . . . to indicate that the number of people who find themselves in the predicament of choosing between benefits and religious beliefs is large enough to create 'widespread unemployment'").

Thus here, the district court correctly held that the County cannot satisfy the strict-scrutiny standard by citing a generalized interest—traffic safety—without showing that it has a particularized compelling interest in preventing traffic from Victory Temple's proposed church. *See* Victory Temple Br. at 54–55. Allowing the government to sidestep RLUIPA would

26

be contrary to the statutory text and would undermine the statute's purpose of protecting the exercise of religion.

**B.    Anecdotes And Appeals To "Common Sense" Cannot Justify A Substantial Burden Under RLUIPA.**

Finally, the County's suggestion that it can satisfy RLUIPA's strict-scrutiny test through anecdotal, non-expert "testimony" and "common sense," County Br. at 8–15, 38–40, is contrary to precedent and would undermine RLUIPA's purpose. This Court has held, in the intermediate scrutiny context, that a "reasonable fit" between a goal and prohibition cannot be satisfied by "mere 'anecdote and supposition.'" *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012) (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 822 (2000)). That rule holds even more strongly in the application of strict scrutiny. Indeed, anecdotes and appeals to common sense present a particular danger in RLUIPA cases, because such evidence easily smuggles in the sort of bias, whether conscious or implicit, that RLUIPA is intended to protect against.

Heightened levels of scrutiny require governments to offer something more than "highly speculative" arguments based on "no specific evidence" when defending a regulation that curtails a fundamental right. *See Yoder*,

27

406 U.S. at 224; *cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)) (First Amendment cannot be satisfied through "speculation or conjecture," but rather the state "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree" (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999)). Such a demonstration requires reliable evidence. "[M]erely argu[ing] . . . that the fit [is] a matter of common sense" is "insufficient," even when the government's claims are "plausible" and the interest is as important as reducing gun violence. *Carter*, 669 F.3d at 419.

Indeed, even deference to expertise "does not justify the abdication of . . . RLUIPA's rigorous standard." *Holt*, 574 U.S. at 364. "[P]olicies 'grounded on mere speculation' are exactly the ones that motivated Congress to enact RLUIPA." *Id.* at 371 (Sotomayor, J., concurring) (quoting 106 Cong. Rec. 16699 (2000)). The Court made clear that even where special "respect" was due to prison official's security expertise, "unquestioning deference" could not be granted where the expertise was not supported by empirical evidence. *Id.* at 364. Under the County's proposed rule, *Holt* would have been resolved in the prison's favor as soon as it established a

28

problem with contraband, despite the lack of evidence that the grooming accommodation would contribute to the problem in any significant way.

Further, as this case well illustrates, watering down RLUIPA's standard as the County urges could open the door to local governments' masking invidious or unconscious bias—their own or their constituents'—with generic and speculative rationales. Anecdotes can easily provide cover for local prejudices against minority religious groups. This sort of concealed bigotry was precisely what RLUIPA was enacted to address. *See* 146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statement of Sen. Hatch and Sen. Kennedy) (RLUIPA's "hearing record compiled massive evidence that [the First Amendment] right is frequently violated. Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation."); *see also id.* at S7775 ("[T]he hearing record reveals a widespread pattern of . . . discrimination against small and unfamiliar denominations as compared to larger and more familiar ones.").

Strict scrutiny ensures that such biases will not needlessly burden the free exercise of one of our most cherished rights. *See Westchester Day Sch. v.*

*Vill. of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (protecting an Orthodox Jewish school from "undue deference to the opposition of a small group of neighbors"); *Guru Nanak*, 456 F.3d at 983 (protecting a Sikh community's efforts to build a temple against "several people['s] complain[ts]" at a "public hearing"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1236 (11th Cir. 2004) ("RLUIPA targets zoning codes which use individualized and discretionary processes to exclude churches, especially 'new, small or unfamiliar churches . . . [like] black churches and Jewish shuls and synagogues." (alteration in original) (quoting 146 Cong. Rec. at S7774 (2000))).

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the district court.

Date: March 22, 2021                    Respectfully Submitted,

CHRISTOPHER PAGLIARELLA          ERIKA L. MALEY
YALE LAW SCHOOL                     *Counsel of Record*
FREE EXERCISE CLINIC               CHRISTOPHER S. ROSS
1919 Pennsylvania Ave NW, Ste 400   ALARIC R. SMITH
Washington, DC 20006               SIDLEY AUSTIN LLP
                                   1501 K Street, N.W.
AMRITH KAUR AAKRE                  Washington, DC 20005
CINDY NESBIT                       Telephone: (202) 736-8000
THE SIKH COALITION
50 Broad St., Ste 504
New York, NY 10004

Counsel for *Amici Curiae*

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

This brief was prepared in a 14-point Book Antiqua, proportional typeface.  Pursuant to Fed. R. App. P. 29(a)(4)(G) and 32(g), I certify, based on the word-counting function of Microsoft Word, that this brief complies with the type-volume limitations of Rule 29(a)(5), in that the brief contains 5,655 words, including footnotes but excluding portions of the brief that are not to be counted, which is less than half the allowable length of a party's principal brief.

/s/ Erika L. Maley
ERIKA L. MALEY
CHRISTOPHER S. ROSS
ALARIC R. SMITH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone:  (202) 736-8000

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Erika L. Maley
ERIKA L. MALEY
CHRISTOPHER S. ROSS
ALARIC R. SMITH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000